## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JASON SUZADAIL,** | : | **Civil No.  3:23-CV-00292** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **LELAND DUDEK,**[1] | : | |
| **Acting Commissioner of Social Security** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

### I.    Introduction

In this case we write the latest chapter in a longstanding legal saga. This saga

began in 2010 when the plaintiff, Jason Suzadail, suffered what an Administrative

Law Judge (ALJ) later described as "a serious motor vehicle accident, suffering

multi-traumatic and severe impairments, including fractured ribs, a pneumothorax

with liver laceration, a fracture of his cervical spine and, most significantly, a

fractured right proximal humerus, that required him to undergo open reduction and

---

[1]Leland Dudek became the Acting Commissioner of Social Security on February 16, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Leland Dudek should be substituted for the previously named defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

internal fixation surgery of his humerus . . . ." (Tr. 108). In the immediate wake of this accident, Suzadail was found to have experienced a closed period of disability and was awarded disability benefits through May of 2012.

Suzadail then applied for renewed benefits alleging that he had suffered a renewed onset of disability in October of 2013, as a result of the ongoing effects of these severe impairments. With respect to this disability claim, every medical source who either treated or examined Suzadail during the relevant time frame from 2013 through 2017 opined that his impairments were severely disabling. Despite this treating and examining source medical consensus, in a series of ALJ decisions spanning the past decade, culminating in this third decision, the consensus view of these sources with hands-on experience addressing Suzadail's medical limitations have been rejected in favor of a non-treating non-examining state agency expert opinion. Moreover, this latest ALJ decision accepts this outlier non-examining source opinion over the existing medical consensus without considering material medical developments relating to Suzadail's care and condition which took place after that state agency opinion was issued in November of 2014.

As discussed below, this was error. Therefore, on the unique and uniquely compelling facts of this case we are compelled to, once again, remand this case for further consideration by the Commissioner.

II.    **Statement of Facts and of the Case**

A. **Background and Procedural History**

This case has a protracted procedural history which spans some fifteen years and entails four separate ALJ determinations. On June 3, 2011, Jason Suzadail filed for disability insurance benefits alleging an onset of disability beginning July 3, 2010. (Tr. 103). At his initial administrative hearing on March 14, 2013, Suzadail through his counsel modified his claim to assert a closed period of disability spanning from July 2010 to May 2012. (Id.) As amended, this closed period claim was approved by an ALJ on April 2, 2013. (Tr. 103-111).

Fourteen months later, on July 3, 2014, Suzadail filed a second application for disability benefits pursuant to Title II of the Social Security Act alleging a renewed onset in October of 2013, some eighteen months after the expiration of his closed period of disability. (Tr. 639). This claim was denied by the ALJ on April 27, 2017. (Tr. 639-50). Suzadail appealed this decision. On September 8, 2018, this Court remanded Suzadail's case to the Commissioner for further evaluation of the treating source opinion and a more detailed articulation of the plaintiff's residual functional capacity. Suzadail v. Berryhill, No. 3:18-CV-0535, 2018 WL 4211737, at *10 (M.D. Pa. Sept. 4, 2018).

Following this remand, the ALJ conducted an additional hearing and issued a second decision on June 19, 2019. (Tr. 898-913). In this second decision, the ALJ once again found that Suzadail had not met the exacting legal standard for disability and denied his claim. (Id.) Suzadail appealed this second denial decision to the district court and on November 18, 2020, the Commissioner requested that the case be remanded for further consideration of the evidence, a request which was granted by the Court, thus setting the stage for this third administrative hearing and decision. (Tr. 925-27).

### B. **Suzadail's Claims and the Clinical Record**[2]

Additional administrative proceedings were then conducted in Suzadail's case before a newly appointed ALJ in March of 2022. (Tr. 821-90). By the time of this second remand, and the third set of administrative proceedings in Suzadail's case, the plaintiff's claim for disability and disability insurance benefits pursuant to Title II of the Social Security Act had been pending for nearly eight years. Moreover, that claim alleged an onset of disability beginning in October of 2013, nearly nine years

---

[2] While Suzadail's disability application cited an array of allegedly disabling emotional and physical impairments, this appeal focusses on the treatment of the medical evidence and treating source opinions concerning his physical condition. Therefore, our analysis and factual narrative will focus of these physical impairments.

prior to these proceedings. Further, it was undisputed that, for purposes of this Title II claim, Suzadail's date last insured was September 30, 2017. Therefore, the ALJ faced a challenging legal and factual analysis and was tasked with attempting to determine whether impairments experienced by Suzadail many years prior to these proceedings had been wholly disabling.

On this score, the ALJ's task was further complicated by the wide array of admittedly severe impairments experienced by Suzadail. This list of severe impairments included: status post internal fixation for cervical spine fracture at C2 level, cervical degenerative disc and facet disease, cervical post-laminectomy syndrome, status post open reduction internal fixation (ORIF) for right humerus fracture, post-traumatic arthritis of the right shoulder, asthma, depressive disorder, obsessive-compulsive disorder (OCD), impulse control disorder, adjustment disorder, alcohol abuse, and substance abuse disorder. (Tr. 827). Finally, the ALJ's task required this decision maker to navigate a complex medical opinion and clinical record which spanned a number of years and included numerous significant entries which were made after state agency experts first opined regarding the nature and severity of Suzadail's impairments in November of 2014.

At the time of these proceedings, several other vocational factors defined the ALJ's task. Suzadail was born on November of 1971 and was 45 years old on his

date last insured, which is defined as a younger individual under the Commissioner's regulations. (Tr. 840). He had a high school education and prior employment in a number of heavy and medium semi-skilled avocations. (Id.)

The medical evidence as it related to Suzadail's case revealed that this claim of disability was directly related to an earlier, severe automobile accident experienced by the plaintiff. In July of 2010, Suzadail "was involved in a serious motor vehicle accident, suffering multi-traumatic and severe impairments, including fractured ribs, a pneumothorax with liver laceration, a fracture of his cervical spine and, most significantly, a fractured right proximal humerus, that required him to undergo open reduction and internal fixation surgery of his humerus, with internal fixation of his odontoid fracture . . . ." (Tr. 108). Suzadail continued to suffer complications from this traumatic injury throughout 2011, displaying weakness, atrophy, and nerve damage in his right shoulder in May of 2011. (Id.) Ultimately, Suzadail's treating physician, Dr. Patrick Brogle, was compelled in December of 2011, to perform a second revision surgery on his right shoulder. (Id.) Suzadail then underwent a period of follow-up treatment and physical therapy which continued until May 2012, when his therapy was discontinued after several no-shows by the plaintiff. (Id.) This May 2012 date when Suzadail ceased attending his physical

therapy corresponded with the end date selected by Suzadail for his initial closed period disability claim.

Suzadail then later claimed a renewed onset of disability beginning on October 4, 2013. (Tr. 113). With respect to this claim, the evidence revealed that Dr. Brogle, the physician who performed several surgeries on Suzadail following this accident and assessed his post-operative recovery, had, on at least two occasions spanning in the year prior to the plaintiff's alleged date of onset, opined that Suzadail's physical impairments were disabling. Thus, in July of 2012, Dr. Brogle completed a form which stated that Suzadail was completely disabled due to his orthopedic impairments from July 2, 2012, through July 2, 2013. (Tr. 1130-31). Dr. Brogle issued a second, similar medical opinion on June 11, 2013, assessing that Suzadail suffered from a "[c]ombinaton of cuff pathology and posttraumatic arthritis affect the right shoulder." (Tr. 298). With respect to these conditions, the doctor went on to state:

> I am quite clear that I do not think this is ever going to improve significantly. . .. I think Jason can be considered permanently disabled with regard to the use of his right shoulder from this injury.

(Id.)

Contemporaneous clinical records from 2013, confirmed that Suzadail was experiencing increasing intractable pain and physical limitations due to the ongoing

effects of this injury. In January of 2013, his treatment provider, St. Luke's Neurosurgical, documented an encounter with Suzadail in which the plaintiff complained of growing pain and limited range of motion in his neck and right shoulder along with numbness in his fingers. (Tr. 249). According to Suzadail, he had attempted work but stopped due to aggravating pain and increased difficulty lifting objects. (Tr. 250). A physical examination revealed both a limited range of range of motion and atrophy in Suzadail's right shoulder. (Tr. 251). Nursing notes at this time also indicated that the plaintiff was experiencing intermittent pain in his neck as well as pain that "shoots up the back of his head," a sensation that the neck "locks up a lot," numbness, and a decreased range of motion. (Tr. 255). During a February 2013 clinical encounter, Suzadail reported chronic pain which he rated at six out of ten in terms of its severity and was limited by his doctor to no lifting over ten pounds. (Tr. 259). In addition, arrangements were made to have Suzadail assessed by pain management specialists.

Between May of 2013 and July of 2014, Suzadail was treated by Dr. Yasin Khan at Comprehensive Pain Centers. (Tr. 341-70). At his May 17, 2013, new patient appointment, the doctor found that he suffered from tenderness in his neck and cervical spine, a limited range of motion in all directions, as well as limited shoulder abduction and reduced reflexes. (Tr. 370). Subsequent treatment notes for

the next fourteen months consistently disclosed chronic pain which Suzadail typically rated at between four and six out of ten in severity. (Tr. 341, 344, 348, 355, 363, 365, 367). These treatment notes also repeatedly described Suzadail's limited range of motion. (Tr. 350, 358, 360, 370). Dr. Khan treated these chronic conditions through medication, facet injections, and cervical rhizotomies, a procedure which entailed severing nerve fibers to try to relieve pain. (Tr. 341-70).

These findings were echoed by Suzadail's primary care physician at St. Luke's, Dr. Gregory Dobash. On May 28, 2014, treatment notes rated Suzadail's pain level at eight out of ten. (Tr. 382). One month later, on June 26, 2014, Dr. Dobash noted that Suzadail was "unable to return to gainful employment as a result of the right humeral fracture" he had experienced. (Tr. 378). At that time, the doctor described in detail Suzadail's restricted range of motion in his right shoulder, stating that he was restricted in terms of flexion, extension, and rotation. Dr. Dobash also found that Suzadail's right arms strength was "abnormal" and rated his strength at three out of five throughout his shoulder, arm, wrist, hand, and fingers. (Tr. 380). Treatment notes from September 2014 further documented Suzadail's limited range of motion and numbness. (Tr. 374, 376).

These symptoms persisted in 2015. Thus, a January 22, 2015, examination disclosed limited range of motion for Suzadail along with "palpable pain" in his right

shoulder. (Tr. 449-50). On June 18, 2015, St. Lukes University conducted a comprehensive quantified functional capacity evaluation on Suzadail. (Tr. 504-09). The results of this evaluation were telling. It was determined that Suzadail was significantly impaired in multiple spheres of physical activity.

At the outset, the report evaluated in a host of areas whether Suzadail could meet the Demand Minimum Functional Capacity; that is, the least acceptable level of activity an individual may possess before returning to work. (Tr. 504). On this score, the report concluded that Suzadail failed to reach this rudimentary benchmark of physical capability in terms of standing, walking tolerance, pushing, pulling, crouching, stooping, kneeling, or crawling (Tr. 505-06). Moreover, the assessment severely limited Suzadail in terms of lifting and carrying, finding that he could never carry more than ten pounds, could only occasionally carry ten pounds, could frequently carry five pounds, and had a constant carrying capacity limited to two pounds. (Tr. 505). The tests and measures conducted in this examination evaluated Suzadail's performance in twenty-seven different areas. Suzadail was found to suffer from deficits in twenty-six of these twenty-seven areas, and those functional deficits ranged from 15% to 89%. (Tr. 508).[3]

_____

[3] While this report comprehensively evaluated Suzadail's physical limitations, we note that it contained one error. The report suggested based upon these objective

On September 9, 2015, Suzadail was treated at St. Luke's emergency room complaining of significant neck pain and spasms which he rated at nine out of ten in severity. (Tr. 484-94). One month later, on October 29, 2015, Suzadail was evaluated at the Health and Wellness Center at Hazleton. (Tr. 495-502). This evaluation documented both his limited range of motion and the pain he suffered when moving. (Tr. 495). At that time, it was determined that Suzadail presented with severe limitations in his cervical range of motion, and had a cervical disability index of 68%, in a scale where 0% would be the best rating possible. (Tr. 496). He was also described as having functional limitations in community activities, home management, and performance in self-care activities of daily living. (Id.) A TENS unit was prescribed for home use by the plaintiff. (Id.)

Between August of 2015 and August of 2016, Suzadail was treated by another pain specialist, Dr. Ammar Abbasi at the Lehigh Valley Physician Group. (Tr. 517-

---

findings that Suzadail could perform light work. (Tr. 507). However, it is clear from the detailed results contained in the report that Suzadail could not do light work as that term is defined by Social Security regulations since: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). Instead, these findings reveal that Suzadail was capable of no more than a limited range of sedentary work which "involves lifting no more than 10 pounds at a time." 20 C.F.R. § 404.1567(a).

49). Dr. Abbasi's treatment notes consistently disclosed chronic pain which Suzadail typically rated at between five or six out of ten in severity. (Tr. 517, 523, 529, 535, 541). These treatment notes also repeatedly described Suzadail's limited range of motion, weakness, and atrophy in his neck. (Tr. 518, 521, 524, 527, 530, 533, 536, 539, 542). This pain was reportedly exacerbated by moving, sitting, standing, or walking. (Tr. 519, 525, 531, 537, 543).

### C. Suzadail's Activities of Daily Living

The evaluation of the severity of Suzadail's physical and mental impairments was further informed by his self-reported activities of daily living. On this score, both Suzadail and a third-party friend, Suzette Frantz, submitted reports in the fall of 2014 detailing the ways in which Suzadail's chronic neck and shoulder pain and immobility limited his ability to function. (Tr. 186-212).

### D. The Medical Opinion Evidence

Given this clinical history, four medical sources opined regarding the degree to which Suzadail's physical impairments were disabling. At the outset, Dr. Brogle, Suzadail's treating surgeon in the wake of his 2010 accident, submitted two statements assessing the severity of the plaintiff's physical impairments. In July of 2012, Dr. Brogle completed a form which stated that Suzadail was completely disabled due to his orthopedic impairments from July 2, 2012, through July 2, 2013.

(Tr. 1130-31). Dr. Brogle issued a second, similar medical opinion on June 11, 2013, several months prior to the alleged onset date in this case. At that time the doctor reported that Suzadail suffered from a "[c]ombinaton of cuff pathology and posttraumatic arthritis affect the right shoulder." (Tr. 298). With respect to these conditions, the doctor went on to state:

> I am quite clear that I do not think this is ever going to improve significantly. . .. I think Jason can be considered permanently disabled with regard to the use of his right shoulder from this injury.

(Id.)

Likewise, the quantified functional capacity evaluation completed by St. Lukes in June of 2015 concluded that Suzadail failed to the least acceptable level of activity an individual may possess before returning to work in terms of standing, walking tolerance, pushing, pulling, crouching, stooping, kneeling, or crawling (Tr. 505-06). This assessment also severely limited Suzadail in terms of lifting and carrying, finding that he could never carry more than ten pounds, could only occasionally carry ten pounds, could frequently carry five pounds, and had a constant carrying capacity limited to two pounds. (Tr. 505). The tests and measures conducted in this examination evaluated Suzadail's performance in twenty-seven different areas and found that he suffered from deficits in twenty-six of these twenty-seven areas, and those functional deficits ranged from 15% to 89%. (Tr. 508).

13

Citing to this comprehensive functional capacity evaluation, on July 1, 2015, Dr. Gregory Dobash, Suzadail's primary care physician completed a physical residual functional capacity questionnaire assessing the severity of the plaintiff's impairments. (Tr. 471-74). In this questionnaire Dr. Dobash noted his extensive longitudinal treatment history with Suzadail, noting that he had cared for the plaintiff since 2011. (Tr. 471). From this unique perspective, Dr. Dobash explained that Suzadail suffered from multiple, chronic orthopedic impairments which left him suffering from constant moderate to severe pain; manifested themselves through right side weakness, pain, and limited range of motion; and created significant deficits in terms of lifting and carrying. (Id.) According to the doctor, Suzadail's pain constantly interfered with his ability to work and limited him to low stress jobs. (Tr. 472). Moreover, Suzadail could only sit or stand for less than an hour at a time and was confined to walking less than a half block in a work environment. (Id.) During an eight-hour workday, Suzadail could sit or stand for less than two hours and would require multiple unscheduled breaks. (Tr. 473). He could only occasionally lift or carry up to ten pounds and could never lift or carry greater weights. (Id.) Further, he could never engage in sustained flexion of his neck and would only rarely be able to turn his head to the left or right. (Id.) Dr. Dobash further opined that Suzadail could not twist, stoop, crouch or climb stairs and ladders; had

14

manipulative limitations; and would miss work more than four days a month as a result of his impairments. (Tr. 474).

Thus, there was a consensus among all of the opining medical sources who actually treated or examined Suzadail that his chronic injuries severely and permanently limited his ability to meet the physical demands of the workplace. Cast against this medical consensus was a single opinion from a non-treating, non-examining state agency source, Dr. Catherine Smith, who opined in November of 2014 that Suzadail could perform light work and could stand, sit, or walk for more than six hours during a workday. (Tr. 118-21). Of course, at the time that Dr. Smith rendered this opinion she did not have the benefit of a host of medical records. Thus, Dr. Smith ventured this estimate of Suzadail's physical capacity with the benefit of the functional capacity evaluation conducted by St. Luke's; the medical opinion of Dr. Dobash; the full treatment records of the pain management specialists, Drs. Khan and Abbasi, the emergency room records from September 2015, or the treatment notes from the Health and Wellness Center in Hazleton which documented severe limitations suffered by the plaintiff.

It was against this medical backdrop that Suzadail's disability claim was considered for a third time.

### E. **The ALJ Decision**

A hearing was conducted in Suzadail's case on March 14, 2022, at which Suzadail and a vocational expert testified. (Tr. 851-90). Following this hearing, on March 29, 2022, the ALJ issued a third decision in Suzadail's case. (Tr. 824-42). In that decision, the ALJ first concluded that Suzadail met the insured requirements of the Act through September 2017, and had not engaged in substantial gainful activity between the alleged onset date of October 4, 2013, and his date last insured September 30, 2017. (Tr. 827). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Suzadail had the following severe impairments: status post internal fixation for cervical spine fracture at C2 level, cervical degenerative disc and facet disease, cervical post-laminectomy syndrome, status post open reduction internal fixation (ORIF) for right humerus fracture, post-traumatic arthritis of the right shoulder, asthma, depressive disorder, obsessive-compulsive disorder (OCD), impulse control disorder, adjustment disorder, alcohol abuse, and substance abuse disorder. (Id.)

At Step 3, the ALJ determined that Suzadail did not have an impairment or combination of impairments that met or medically equaled the severity of one of the disability listing impairments. (Tr. 828-30). Between Steps 3 and 4, the ALJ then fashioned the following functional capacity ("RFC") for the plaintiff:

After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: He could lift and carry 10 pounds and under with the (dominant) right upper extremity, but he could lift and carry 20 pounds occasionally and 10 pounds frequently with the (nondominant) left upper extremity. He could occasionally balance, stoop, crouch, kneel, and climb, but never on ladders, ropes, or scaffolds, and never crawl. He could never push/pull with the (dominant) right upper extremity, but he could frequently push/pull with the (nondominant) left upper extremity. He could perform occasional lateral and forward reaching (defined as full extension of the arm for forward reaching) with the (dominant) right upper extremity. He had no limitation on lateral or forward reaching with the (nondominant) left upper extremity. He could perform frequent fine and gross manipulation for handling and fingering. He was limited to frequent exposure to temperature extremes of cold, wetness, humidity, fumes, odors, dusts, gases, and poor ventilation. He was limited to occasional exposure to vibrations and hazards including moving machinery and unprotected heights. He could do simple, routine tasks but no complex tasks, in a low stress environment (defined as occasional decision making and occasional changes in work setting). He was limited to frequent interaction with co-workers, supervisors, and the public.

(Tr. 830).

In fashioning this RFC, the ALJ rejected the opinions and findings set forth by the treating and examining sources who had direct contact with Suzadail during the relevant time frame concluding that these reports which were grounded in first-hand observation of the plaintiff deserved little weight. (Tr. 838-39). Instead, the ALJ chose to afford great weight to the sole outlier opinion of the non-examining source. Dr. Smith. (Tr. 836). Moreover, in reaching this conclusion, the ALJ failed

to take into account the fact that Dr. Smith's November 2014 opinion was rendered prior to a host of material medical developments in Suzadail's case, including the functional capacity evaluation conducted by St. Luke's; the medical opinion of Dr. Dobash; the full treatment records of the pain management specialists, Drs. Khan and Abbasi, the emergency room records from September 2015, or the treatment notes from the Health and Wellness Center in Hazleton which documented severe limitations suffered by the plaintiff.

Having made these findings, the ALJ concluded that Suzadail was unable to perform his past relevant work but retained the ability to perform other jobs that existed in significant numbers in the economy. (Tr. 840-42). Accordingly, the ALJ once again denied Suzadail's claim of disability. (Id.)

This appeal followed. (Doc. 1). On appeal, Suzadail's principal argument is that the ALJ erred in weighing this medical evidence. Because we agree that the ALJ's reliance on the non-treating, non-examining source opinion is not sufficiently explained given the significant medical developments which occurred after that opinion was rendered, we agree that this case must be remanded for further consideration by the Commissioner. Therefore, we will vacate the decision of the Commissioner and remand this case for further consideration of this evidence.

III.    **Discussion**

    A.    **Substantial Evidence Review – the Role of this Court**

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205,

at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); <u>Burton v. Schweiker</u>, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); <u>see also</u> <u>Wright v. Sullivan</u>, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); <u>Ficca</u>, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." <u>Zirnsak v. Colvin</u>, 777 F.3d 607, 611 (3d Cir. 2014) (citing <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." <u>Burnett v. Comm'r of Soc. Sec. Admin.</u>, 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In <u>Burnett</u>, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. <u>Id</u>. at 120; <u>see Jones v. Barnhart</u>, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "<u>Burnett</u> does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." <u>Jones</u>, 364 F.3d at 505.

<u>Diaz v. Comm'r of Soc. Sec.</u>, 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

### B.     Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); <u>see also</u> 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42

U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe

impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a

physician is misguided." <u>Cummings v. Colvin</u>, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. <u>Biller</u>, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. <u>See Titterington v. Barnhart,</u> 174 F. App'x 6, 11 (3d Cir. 2006); <u>Cummings v. Colvin</u>, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if

it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory

26

explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

## C.    Legal Benchmarks for the ALJ's Assessment of Medical Opinion Evidence.

The Commissioner's regulations which applied at the time of this disability application in 2014[4] also set standards for the evaluation of medical evidence, and defined medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's] symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairments(s), and [a claimant's] physical or mental restrictions." 20 C.F.R. §404.1527(a)(2). Regardless of its source, the ALJ is required to evaluate every medical opinion received. 20 C.F.R. §404.1527(c).

_____

[4] These regulations were substantially revised in March of 2017, but those revisions do not apply to this case which was first filed in 2014.

In deciding what weight to afford competing medical opinions and evidence, the ALJ is guided by factors outlined in 20 C.F.R. §404.1527(c). "The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR 96-6p, 1996 WL 374180 at *2. Treating sources have the closest ties to the claimant, and therefore their opinions generally entitled to more weight. <u>See</u> 20 C.F.R. §404.1527(c)(2)("Generally, we give more weight to opinions from your treating sources..."); 20 C.F.R. §404.1502 (defining treating source). Under some circumstances, the medical opinion of a treating source may even be entitled to controlling weight. 20 C.F.R. §§04.1527(c)(2); <u>see also</u> SSR 96-2p, 1996 WL 374188 (explaining that controlling weight may be given to a treating source's medical opinion only where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it is not inconsistent with the other substantial evidence in the case record).

Where no medical source opinion is entitled to controlling weight, the Commissioner's regulations direct the ALJ to consider the following factors, where applicable, in deciding the weight given to any non-controlling medical opinions: length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; the extent to which the source presented relevant

evidence to support his or her medical opinion, and the extent to which the basis for the source's conclusions were explained; the extent to which the source's opinion is consistent with the record as a whole; whether the source is a specialist; and, any other factors brought to the ALJ's attention. 20 C.F.R. §404.1527(c). These benchmarks, which emphasize consideration of the nature of the treating relationship, also call for careful consideration of treating source opinions.

Indeed, this Court has addressed the weight which should be afforded to a treating source opinion under the regulations which applied in a Social Security disability appeals prior to March of 2017 and we have consistently emphasized the importance of such opinions for informed decision-making in this field, noting that:

> "A cardinal principle guiding disability, eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000)(citations omitted); See also Brownawell v. Commissioner of Social Security, 554 F.3d 352, 355 (3d Cir. 2008). In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation, or lay opinion." Morales v. Apfel, supra at 317 .

Morder v. Colvin, No. 3:16-CV-213, 2016 WL 6191892, at *10 (M.D. Pa. Oct. 24, 2016).

Thus, an ALJ may not unilaterally reject a treating source's opinion and substitute the judge's own lay judgment for that medical opinion. Instead, the ALJ typically may only discount such an opinion when it conflicts with other objective tests or examination results. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 202–03 (3d Cir. 2008). Likewise, an ALJ may conclude that discrepancies between the treating source's medical opinion and the doctor's actual treatment notes justifies giving a treating source opinion little weight in a disability analysis. Torres v. Barnhart, 139 F. App'x 411, 415 (3d Cir. 2005). Finally, "an opinion from a treating source about what a claimant can still do which would seem to be well-supported by the objective findings would not be entitled to controlling weight if there was other substantial evidence that the claimant engaged in activities that were inconsistent with the opinion." Tilton v. Colvin, 184 F. Supp. 3d 135, 145 (M.D. Pa. 2016). However, in all instances in social security disability cases the ALJ's decision, including any ALJ judgments on the weight to be given to treating source opinions, must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter, 642 F.2d at 704. Indeed, this principle applies with particular force to the opinion of a treating physician. See 20 C.F.R. §404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). "Where a conflict in the evidence exists,

30

the ALJ may choose whom to credit but 'cannot reject evidence for no reason or the wrong reason.'" Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (quoting Mason, 994 F.2d at 1066); see also Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000). Therefore, the failure on the part of an ALJ to fully articulate a rationale for rejecting the opinion of a treating source may compel a remand for further development and analysis of the record.

There is a further consideration that applies in a case such as this which is governed by the Commissioner's treating source rule. In this setting, when an ALJ opts to accord greater weight to a non-examining state agency source:

> [C]ase law also cautions courts to take into account the fact that state agency non-treating and non-examining source opinions are often issued at an early stage of the administrative process. While this fact, standing alone, does not preclude consideration of the agency doctor's opinion, see Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011), it introduces another level of caution that should be applied when evaluating reliance upon such opinions to discount treating and examining source medical statements. Therefore, where a state agency non-treating and non-examining opinion does not take into account material medical developments which have occurred after the opinion was rendered, that opinion often cannot be relied upon by the Commissioner to carry its burden of proof. See Batdorf v. Colvin, 206 F. Supp. 3d 1012, 1023 (M.D. Pa. 2016).

Foose v. Berryhill, No. 3:17-CV-00099, 2018 WL 1141477, at *7 (M.D. Pa. Mar. 2, 2018). In short, it is well-recognized that: "It can be inappropriate for an ALJ to rely on a medical opinion that was issued prior to the close of the period of claimed

31

disability, particularly if a claimant's medical condition changes significantly after the opinion is issued." Smith v. Astrue, 961 F. Supp. 2d 620, 644 (D. Del. 2013) (collecting cases). In fact, we have frequently remanded cases for further consideration by the Commissioner when an ALJ relies upon a non-examining state agency source opinion and rejects treating and examining source opinions, but the record reveals that there were significant subsequent medical developments which were not considered by the non-examining state agency expert.[5] As we have observed on this score:

> [W]here a non-treating and non-examining opinion does not take into account material medical developments that have occurred after the opinion was rendered, that opinion often cannot be relied upon by the Commissioner to carry its burden of proof. See Batdorf v. Colvin, 206 F. Supp. 3d 1012, 1023 (M.D. Pa. 2016). As a matter of law and common sense, material medical developments that take place after a state agency or consulting expert's review of a claimant's file frequently can undermine the confidence which can be placed in this non-treating and non-examining source opinion. Cadillac v. Barnhart, 84 F. App'x 163, 168 (3d Cir. 2003).

---

[5] See e.g., Moffa v. Dudek, No. 3:24-CV-442, 2025 WL 595268, at *14 (M.D. Pa. Feb. 24, 2025); Sceranka v. Saul, No. 1:19-CV-1953, 2020 WL 4819923, at *11 (M.D. Pa. Aug. 19, 2020); Dieter v. Saul, No. 1:19-CV-1081, 2020 WL 2839087, at *9 (M.D. Pa. June 1, 2020); Weller v. Saul, No. 1:19-CV-884, 2020 WL 2571472, at *8 (M.D. Pa. May 21, 2020); Foose v. Berryhill, No. 3:17-CV-00099, 2018 WL 1141477, at *9 (M.D. Pa. Mar. 2, 2018).

Sceranka v. Saul, No. 1:19-CV-1953, 2020 WL 4819923, at *10 (M.D. Pa. Aug. 19, 2020).

### D.    **This Case Will Be Remanded.**

So it is here. In the course of denying Suzadail's disability claim, the ALJ afforded great weight to a non-examining state agency opinion rendered in November of 2014. However, in following this course, the ALJ failed to take into account a host of subsequent medical developments which undermined the degree of reliance which could be placed upon this single outlier opinion from a source who never treated, examined, or even met the plaintiff. These significant, intervening medical developments, which cast doubt upon the weight which this state agency expert deserved, included the June 2015 functional capacity evaluation conducted by St. Luke's; the July 2015 medical opinion of Dr. Dobash; the full treatment records of the pain management specialists, Drs. Khan and Abbasi; from 2015 and 2016; the emergency room records from September 2015, or the treatment notes from the Health and Wellness Center in Hazleton in October of 2015 which documented sever limitations suffered by the plaintiff.

It is well-settled that: "As a matter of law and common sense, material medical developments which take place after a state agency or consulting expert's review of a claimant's file frequently can undermine the confidence which can be placed in

this non-treating and non-examining source opinion." <u>Weller v. Saul</u>, No. 1:19-CV-884, 2020 WL 2571472, at *8 (M.D. Pa. May 21, 2020). Recognizing that "[i]t can be inappropriate for an ALJ to rely on a medical opinion that was issued prior to the close of the period of claimed disability, particularly if a claimant's medical condition changes significantly after the opinion is issued," <u>Smith</u>, 961 F. Supp. 2d at 644, we find that these material intervening medical developments undermine any reliance that can be placed on the early state agency expert opinion of Dr. Smith.

While this error, standing alone, warrants another remand in this case, we note a number of other aspects of the medical opinions evaluation in this case which warrant further consideration on remand. At the outset, the ALJ's decision failed to address, analyze, or even acknowledge the June 2013 treating source opinion of Dr. Brogle, Suzadail's orthopedic specialist, who opined that:

> I am quite clear that I do not think [his orthopedic injury] is ever going to improve significantly. . .. I think Jason can be considered permanently disabled with regard to the use of his right shoulder from this injury.

(Tr. 298).

This treating source opinion, which was rendered shortly before the claimed onset of the plaintiff's disability by a source who had a lengthy longitudinal history

with Suzadail, strongly corroborated the other treating and examining source evidence in this case, yet it received scant notice from the ALJ. More is needed here.

In addition, the ALJ's justification for assigning little weight to the comprehensive functional capacity evaluation performed at St. Luke's in June of 2015 was wanting. In discounting this evaluation, the ALJ described it as "just a snapshot of the claimant's functioning on a longitudinal basis." (Tr. 839). However, this dismissive characterization of what was an extensive evaluation ignores the entire factual context of this case. Suzadail's claimed impairments were not fleeting or episodic in nature. Rather, it is clear that they were chronic, ongoing conditions which were unlikely to ever improve according to treating doctors. Therefore, this functional capacity evaluation is not a mere snapshot of some passing but acute condition, as the ALJ implied. Rather, it reflected the documentation of the accumulated impairments suffered by Suzadail over the years. As such, it was not subject to summary dismissal.

Finally, the ALJ assessment of Dr. Dobash's treating source opinion misstated at least one aspect of that opinion. Fairly construed, Dr. Dobash's opinion concluded that Suzadail could never engage in sustained flexion of his neck and would only rarely be able to turn his head to the left or right. (Tr. 474). In discounting the doctor's report, the ALJ mischaracterized this aspect of his opinion suggesting that

the doctor had opined that Suzadail could never even glance down in a fleeting fashion. (Tr. 839). Relying upon this misstatement, the ALJ then dismissed the opinion as warranting little weight. (Id.) It is axiomatic that, under the treating source rule, an ALJ may not mischaracterize the evidence and then rely upon that misstatement to discount the treating source opinion. This, too, was error.

Yet, while case law calls for a remand and further proceedings by the ALJ in this case assessing this claim in light of this evidence, nothing in our opinion should be construed as suggesting what the outcome of that final and full analysis should be. Rather, that final assessment of the evidence must await a thorough consideration and development of this evidence on remand by an ALJ. Therefore, nothing in this opinion should be deemed as expressing a view on what the ultimate outcome of any reassessment of this evidence should be. Rather, that task should remain the duty and province of the ALJ on remand.

### IV.    <u>Conclusion</u>

For the foregoing reasons, the decision of the Commissioner in this case will be vacated and the case will be remanded for further consideration by the Commissioner.

An appropriate order follows.

_S/ Martin C. Carlson_
Martin C. Carlson
United States Magistrate Judge

DATED: March 31, 2025